# McMullin *v.* Bodine, Appellant.

*Contracts—Employment contract—Construction—Net earnings —Elements of manufacturing cost—Equity.*

In a proceeding in equity to recover possession of certain bonds deposited in escrow for defendant's benefit as a conditional extra compensation under an employment contract providing for their delivery to him whenever the glass company by which he was employed "shall have earned the sum of $500,000 net, exclusive of royalties and interest, for twelve months;......the term net...... to mean the difference between the actual cost of manufacture and the price obtained for the glass," the term "price obtained

for the glass" was construed to mean the price obtained after deducting the cost of marketing; and the whole contract was construed to exclude from the "cost of manufacture" all fixed charges which the company would have been compelled to pay whether it manufactured glass or not, as being within the term "interest charges"; and upon it appearing by an account stated under this construction that the net earnings of the company for the period were less than the amount stipulated; it was decreed that the bonds did not pass to defendant.

Argued Oct. 22, 1914. Appeal, No. 91, Oct. T., 1914, by S. L. Bodine, from decree of C. P. Allegheny Co., July T., 1911, No. 203, in equity, determining title to bonds in case of M. K. McMullin and T. H. Given v. S. L. Bodine and the Farmers Deposit National Bank of Pittsburgh. Before FELL, C. J., BROWN, MESTREZAT, STEWART and MOSCHZISKER, JJ. Affirmed.

Bill and cross-bill to recover possession of bonds deposited in escrow under employment agreement. EVANS, J., filed the following opinion:

The plaintiffs are stockholders and creditors of the American Window Glass Company and the American Window Glass Machine Company. The defendant, S. L. Bodine, for a number of years prior to the circumstances producing this litigation, had been a member of the Board of Directors of the American Window Glass Company.

On February 1, 1904, the Board of Directors of the American Window Glass Company created a position as chairman of the Executive Committee and the defendant, S. L. Bodine, was appointed to fill that position. The resolution appointing him defined his duties as follows:

"That said chairman shall have entire charge of the factories and manufacturing department of said company and full authority to employ and discharge all superintendents of factories and other employees."

On the 15th of August, 1905, the plaintiffs, McMullin

and Given, entered into the following contract with the defendant Bodine:

"Whereas the first parties are largely interested as stockholders and creditors of the American Window Glass Machine Company and the second party is chairman of the executive committee and in charge of the factories of the American Window Glass Company, and the first parties are desirous of providing some extra compensation for the said second party in case of his continuance with the said company for the period hereinafter set forth, and to recognize his efforts during said period to put the said company upon a successful earning basis;

"Now this agreement witnesseth, that the first parties agree to deposit in a box in the Farmers National Bank's safe deposit vault, one hundred of the six per cent. debenture bonds of the American Window Glass Machine Company of the par value of $1,000 each (fifty of said bonds having been contributed by M. K. McMullin and fifty by T. H. Given), to be delivered to the said second party whenever said American Window Glass Company shall have earned the sum of $500,000 net, exclusive of royalties and interest, for twelve months, in which case said second party shall also receive the said twelve months' interest at the time of the delivery of said bonds, provided that the said bonds and interest shall not be delivered and paid to the second party unless said amount, namely, $500,000 shall have been earned by said company as aforesaid within two years from July 14, 1905, and provided further that the said second party shall have continued with the said company in his present or some equally active and responsible executive position until the time fixed herein for the delivery of said bonds.

"If said bonds are not delivered under the terms of this agreement, then they are to be returned to the first parties or their legal representatives. Each of the parties to this agreement will have a key to said safe deposit

box and access shall be had only when all three are present.

"The second party agrees to the conditions of this agreement and to use his best endeavors to put the company upon an earning basis.

"In case any difference arises between the parties to this agreement, the parties of the first part shall select one arbitrator, the party of the second part one, and those two a third, the decision of the majority to be binding and without further appeal.

"The term 'net' in this agreement is understood and agreed to mean the difference between the actual cost of manufacture and the price obtained for the glass."

Prior to February 1st, 1904, the American Window Glass Company being in financial difficulties, a contract was made with a committee of bankers, representing the banks to whom the glass company was indebted, and section 5 of that agreement provided "That said bankers committee may exercise such discretion over the management of its business affairs as shall to it seem proper."

About the 30th of October, 1906, the bankers committee, at that time composed of F. H. Skelding, Chairman, M. K. McMullin, T. H. Given, Samuel Bailey, Jr., and J. R. Paull, passed a resolution requesting the resignation of the defendant Bodine as chairman of the executive committee. The request to Bodine for his resignation was given to him by Mr. Skelding on October 30, 1906, and on the following day the defendant presented his resignation to the executive committee of the American Window Glass Company. The defendant, on the request of plaintiffs, having refused to deliver the bonds to them, this bill was filed, alleging that the defendant, by his resignation as chairman of the executive committee, and the failure on the part of the American Window Glass Company during his incumbency to earn the $500,000 provided by the contract, had destroyed any claim of the defendant to the bonds in question.

An examination of the agreement between the plain-

tiffs and Bodine discloses the fact that Bodine was entitled to the bonds "whenever said American Window Glass Company shall have earned the sum of $500,000 net, exclusive of royalties and interest, for twelve months." That period was limited to within two years, but if at the end of any twelve months within that two years the American Window Glass Company had earned $500,000 in accordance with this agreement, the bonds were immediately to be delivered to Bodine. The provision for the continuance of Bodine with the company is that he shall continue "until the time fixed herein for the delivery of said bonds." "The time fixed herein" for the delivery of the bonds, as I have stated, was immediately at the end of the twelve months period in which the American Window Glass Company had earned the $500,000. If then, as contended by the defendant in this case, for the twelve months ending September 7, 1906, the American Window Glass Company had earned $500,-000, in accordance with the terms of this agreement, the defendant was entitled to receive the bonds immediately. And as it is undisputed that up to that time he had continued as chairman of the executive committee of the American Window Glass Company, the sole question then is whether or not the American Window Glass Company did, during the twelve months ending September 7, 1906, earn the $500,000 in accordance with the terms of this agreement.

The American Window Glass Company was in the business of manufacturing window glass and selling its product. In the broadest sense, all of its income was derived from the sale of its glass and all of its expenditures were occasioned in the manufacture of glass and in the sale of same.

In the second paragraph of the agreement between the parties to this suit it is provided that the bonds in question are "to be delivered to the said second party whenever said American Window Glass Company shall have

earned the sum of $500,000 net, exclusive of royalties and interest, for twelve months."

Net earnings have been defined to be what is left after the deduction of the cost of operating the properties from which the earnings are produced, and therefore, if there were nothing else in this case except the phrase above quoted, after deducting the interest on the bonds and the royalties on the patents used by the company, all the remainder of the expenses of this company would be deducted from the gross earnings in order to produce the net earnings. But the last paragraph of the contract provides as follows: "The term 'net' in this agreement is understood and agreed to mean the difference between the actual cost of manufacture and the price obtained for the glass." We have, therefore, to determine not only what was meant by the first clause standing alone, but what was meant by the first clause, as explained by the second. It is evident that it was not the intention of the parties to substitute a different agreement, by this last clause, for that they had intended by the first one; but the purpose of the last clause was to make plainer the meaning of the first. Viewed in this light, the purpose in interpreting the contract should be to ascertain what fair interpretation will give a reasonable effect to both clauses. What then is meant by "the price obtained for the glass"? If this were standing alone, I take it that a reasonable interpretation of the clause would mean the price which the purchaser paid for the glass; but if we give that interpretation to the phrase in this contract, we can give no effect whatever to the first clause of the contract which provides that the bonds shall be turned over when the net earnings of the company shall equal $500,000. And for that reason, in my judgment the meaning of the term "the price obtained for the glass" means the price obtained after deducting the cost and expenses of marketing the glass.

By the terms of the first provision in this contract, the only deduction from expenses to be charged in order

to arrive at the net earnings was interest and royalties. By the terms of the explaining clause, the deductions which are to be made from the price obtained for the glass is the actual cost of manufacture, and at first it might seem that there is no difference between the actual cost of manufacture and all those charges which would be considered in arriving at the net earnings after deducting the interest charges and royalties. And yet, from an examination of the items of expense of the American Window Glass Company, I take it that there is a class of expenditures which ordinarily, in the broad sense, are chargeable to the cost of manufacture which were not intended to be included in the cost of manufacture in this case. Such expenditures were the taxes on the land, the insurance on the buildings, the expenditures occasioned in the maintenance of properties that were not in actual operation in the production of glass—in other words, those fixed charges which the company would have been compelled to pay whether it manufactured glass or not, and these, I take it, are excluded, not because they are not chargeable to the cost of manufacture, but because they come within that class of excluded items by the terms of this contract—interest charges. They meant, and by the last clause it was intended that it should be made clear, that only such items should be charged to manufacture which were the result of the operation of the plants in the manufacture of glass as conducted by the American Window Glass Company. Now it will be observed again that it is not a question between the parties to this contract as to what expenditures shall be made. It is a question of the American Window Glass Company. It is an examination of its affairs and it is a determination of what was the result of its operations which will decide the question between these parties.

That the meaning which I have given to the phrase "the price obtained for the glass" was the same as the understanding of Mr. Bodine when he filed his answer in

this case is shown by the averment on page 3 of his answer, as follows:

"I aver, however, that it was agreed that the sum of $500,000 net, which the said company was to earn before I became entitled to the bonds, was to be ascertained by taking the difference between the actual cost of manufacture and the selling price obtained for the glass, without any deduction therefrom for interest, royalties, improvements or other items of a similar character or such as did not constitute the actual cost of labor and materials to the American Window Glass Company in manufacturing and selling."

It is true that at the trial of the case the defendant requested permission to amend the answer by striking out the words "and selling," which request was refused for the reason, as I thought then and now, that it was immaterial. It is not the purpose now to hold Mr. Bodine concluded by the allegations of his answer, but the amendment proposed could not change the fact that when he filed his answer he was of the opinion that the actual cost of selling the glass was to be deducted from the price paid for it by the purchaser.

Another important question in determining the controversy in this case is what number of boxes of glass shall constitute the basis for our calculation, and what basis of cost per box. The American Window Glass Company, during the year ending September 7, 1906, manufactured 2,204,894 boxes of glass reduced to single strength. It sold during that year 2,282,667 boxes. The average factory cost of the 2,204,894 boxes of glass can be determined and the cost of all the glass on hand on September 6, 1905, can be determined. It does not appear to be possible to ascertain how many boxes of glass manufactured during the year ending September 7, 1906, were sold during that year, or how many boxes of the glass which were on hand at the beginning of the year were sold during that year, and therefore it is impossible to determine accurately

what was the factory cost per box of the glass that was sold during the year ending September 7, 1906. It is claimed by the plaintiff that a reasonable method of arriving at that fact would be to take the entire cost of the 2,204,894 boxes of glass manufactured during the year and the cost of all of the glass on hand at the beginning of the year and determine the average cost of all of that glass and make that the cost per box of the glass sold during the year. If it were known that the ratio between the glass sold from the glass on hand at the beginning of the year and the glass sold from the amount manufactured during the year was the same as the cost of manufacturing the two sets of glass, the method suggested by the plaintiff would be a reasonable one; but we do not know that fact. It is contended by the defendant that the proper method for calculation is to take the entire amount of glass sold during the year ending September 7, 1906, and determine the cost of the entire amount by the average cost per box of the glass manufactured during that year. There is no possibility that that method would be accurate. It is known that the glass on hand at the beginning of the year which ended September 7, 1906, cost more per box than the glass manufactured during that year, and therefore if we assume that the entire product of the year was sold and that only 77,000 boxes of the old glass were sold, yet that 77,000 boxes cost more to manufacture per box than the average cost per box for the glass manufactured during the year ending September 7, 1906.

I call attention again to this fact; it is not a question of what is fair between these parties; it is a question of what was the result of the operation to the American Window Glass Company. Being in a position where we cannot determine the fact, I have assumed a position at least as favorable to the defendant as, in my judgment, he could ask, and certainly more favorable to the defendant than the actual facts would probably disclose. I have assumed that the entire product of the year, to wit:

2,204,894 boxes of glass, were sold that year and on that basis alone, that the average cost per box of that glass had determined the factory cost of the production of glass sold during that year.

There are two items which appear upon the books of the American Window Glass Company as "income" which are in fact deductions from the cost of manufacture—an item of $41,994.34 received from the Derry Sand Works, and an item of $83,645.17 received as dividends from the Western Pennsylvania Natural Gas Company. The American Window Glass Company used the sand in the manufacture of its glass and natural gas as a fuel. It owned the Derry Sand Works and it owned the Western Pennsylvania Natural Gas Company. On the books of the American Window Glass Company the sand was billed to the glass company at a certain price. Billing the sand at that price, the forty-one thousand and odd dollars was the difference between the actual cost of the sand as produced by the Derry Sand Works, and the amount at which it had been billed to the glass company. As the Derry Sand Works was the property of the American Window Glass Company, the actual cost of its sand to the glass company was the forty-one-thousand and odd dollars less than the price at which the sand was billed to it. The same situation applies to the Western Pennsylvania Natural Gas Company. That gas company billed its gas to the American Window Glass Company at a certain price and at the end of the year there was an apparent profit to the Gas Company of eighty-three and some odd dollars. The American Window Glass Company took all the gas of the Western Pennsylvania Natural Gas Company. It never paid any actual money to the gas company. It was charged by the gas company with the gas it used, at a certain price per thousand cubic feet and at the end of the year the glass company was credited with eighty-three thousand dollars of dividends. In fact, the cost to the American Window Glass Company of its gas was the amount at

which the gas was charged, less the amount of the dividends.

There is an item of $55,057.57 appearing upon the books of the American Window Glass Company as "shutdown expenses," and it is alleged by the defendant that while these expenses were incurred at the factory during the twelve months ending September 7, 1906, they were not proper charges against the cost of manufacturing the glass for that year. These expenses were incurred during the months of June, July and August while the factories were not in operation. An examination of the item will show that with the exception of $2,983.57, taxes on real estate, the amount is made up of expenses in repairs about the different factories and the maintenance of an organization at the factories during the shutdown, such as the payment of the salaries of the superintendents and of men employed by the year. The defendant, Mr. Bodine, was in charge of the factories at that time and these repairs were made under his management. They were occasioned by the operations of the company in the manufacture of glass during the previous part of that year. The wearing out of machinery, of furnaces and of other implements used in the manufacture of glass during that year was just as direct a cost of the manufacture of that glass as was the gas that was burned. In this connection Mr. Bodine's testimony throws some light upon the question of these expenses. He was being examined upon the claim of the plaintiff that a certain percentage should be allowed as going to the cost of manufacturing for the general depreciation of the plants. Mr. Bodine was asked:

"Q.—Did they have any depreciation or reserve fund to take care of replacement?

"A.—They did not.

"Q.—How did they take care of replacement?

"A.—When they had to replace anything they charged it up to the cost of the manufacture at that time." Now that, I take it, is just what they did in this connection.

They made the repairs during the time that the plants
were shut down and those repairs presumably were
made every year during the time that the plants were
shut down and, as Mr. Bodine says, they were charged
to the cost of manufacture at that time.

There is another item which appears on the books as
"experimental work." It appears that the American
Window Glass Company was manufacturing window
glass by the use of what they call window glass ma-
chines and the operation of those machines had not been,
up to this time, a success. They were using those ma-
chines and experimenting all the time trying to perfect
them and trying to improve their use of them, and it was
for the purpose of lowering the cost of production and
increasing the quality of the glass produced that Mr.
Bodine was employed and that this bonus was offered
to him in case he made a success. Mr. Bodine, in his
answer, says:

"During my connection with the company experiments
were conducted continuously under my direction, which
experiments resulted in largely improving or perfecting
the operation of said glass manufacturing machine; the
employees of the company were reorganized, the business
of the company was systematized and the cost of manu-
facture and the expenses of the company largely reduced
and its business largely increased." In my judgment,
the cost of these experiments, being made directly in
connection with the manufacture of the glass, they were
made for the purpose of reducing the cost and improv-
ing the quality of the glass.

The expenses of the general office of this company dur-
ing the period which we are considering amounted, ac-
cording to the books of the company, to $165,704.04.
Some of the items that made up that amount can be
clearly traced to the cost of manufacture. Some of them
can be clearly traced to the cost of marketing the glass.
Others appear to be partially expenditures in the cost of
manufacture and partially expenditures in connection

with selling. Take, for instance, the freight department. The principal part of the business of that department was the routing of the glass sold; but some of its time was taken up in expediting the shipments of incoming material.

In regard to one class of items there is some conflict of testimony, and that is the item of $25,513.01 as a part of the general office expenses particularly chargeable to the engineering department. The testimony of the plaintiff is that the item consisting of salaries of engineers, draftsmen and clerks engaged in making plans and specifications of and supervising alterations, additions and repairs to factories and equipment both electrical and mechanical, together with their travelling expenses and office work, was charged on the books as a part of the cost of ordinary repairs for that year, and that the salary and expenses of the engineering department, which were occasioned by the improvements and betterments made to the factories were charged in a separate item. As against this, Mr. Bodine himself and the chief engineer of the company at that time testified that comparatively little time of the engineering department was taken up in the making of repairs. It will be observed that this situation was produced six years ago; that the two witnesses for the defense are testifying generally and entirely from their recollection, whereas this item was placed on the books of the American Window Glass Company at a time when Mr. Bodine was chairman of the executive committee of that company and especially in charge of the manufacturing department and the apportionment was made at that time, and in my judgment that is entitled to greater weight than the recollection of the defendant and his witness.

There is one class of items included in the general office expenses which I do not think should be classed with the actual cost of manufacture or is a proper deduction in the cost of selling the glass. It is true that in the broad sense of the term this would go to one or

the other, possibly partly to one and partly to the other of these two; but I think the idea here is that the expense to be allowed is to be more direct than this item would be. I refer to the auditing division. The auditing division has to do with the books of the company after they have been made up by others, and the expenses of the auditor and his assistants and employees are not such as I take it should be directly chargeable to the cost of manufacture or to the cost of marketing the glass.

There is another class of items in this $165,000 of general office expenses which it is difficult to apply, and that is the legal expenses, and therefore I have excluded them as properly chargeable either to the sales account or to the manufacturing account, and also the expenses of the directors and the executive committee.

There is an item including in the statement filed by the plaintiff of the factory cost of the glass of $26,476.53, the cost of warehousing the glass. I have left that item in the factory cost, although strictly speaking, it is not an item of cost of manufacturing, but it is part of the expense of selling, and while it would be more regular to deduct it from the factory cost and add it to the expense of selling, it would not make any difference in the result.

There is an item of $362,249.18, being the cost of boxing and packing the glass manufactured during this period, which is included in the factory cost, as shown by the books of the American Window Glass Company. It is claimed by the defendant that this is not a proper charge to the actual cost of manufacture; that the actual cost of manufacture ceases when the panes of glass are cut in shapes to be used by the trade. As I interpret the contract between the parties to this case, it is not material whether this sum charged for boxing and packing is part of the cost of manufacture or a part of the cost of the sale of the glass. In my judgment, it is clearly a part of the cost of manufacture. As I stated before, this corporation had two purposes in its operations—the

manufacture and sale of glass. You cannot apply the strict scientific meaning to words in their application to general business. In a business sense an article is manufactured when it is ready for the market, and to say that the panes of glass lying on the cutter's table are ready for market would be, in my judgment, an absurdity. Glass is always marketed in certain styles of boxes, and the preparation of the panes of glass for the market includes the putting of them in those boxes and the furnishing of the boxes themselves.

It was contended in the answer of Mr. Bodine, that his discharge was brought about by the plaintiffs in this Bill, McMullin and Given, for the purpose of preventing his complying with the terms of his contract, and testimony of Mr. Skelding, chairman of the Bankers' Committee, was offered to sustain that proposition. Mr. Skelding's testimony was to the effect that McMullin and Given demanded the discharge of Mr. Bodine and demanded it for the reason that if he were permitted to remain he might be able to earn the $100,000 of bonds and that McMullin and Given coerced the committee into demanding the resignation of Bodine. Mr. Skelding is contradicted in this matter by the other four members of that committee, and instead of the weight of the evidence being with the defendant, on whom is the burden of proof of that fact, in my judgment the weight of the evidence is clearly the other way.

The defendant offered to prove, during the trial of the case, by expert bookkeepers and by persons alleged to be experts in the manufacture of glass, as to what items of expense were properly included in the actual cost of manufacture. On objection, I excluded this testimony. I was of the opinion then, and am still, that if the facts be known it does not require expert knowledge, either as a bookkeeper or as a manufacturer of glass, to determine what is properly included or properly chargeable to the actual cost of the manufacture of the glass. It seems to me that any man of intelligence can deter-

mine that question, but this is particularly true in this case where the meaning of that phrase must be first determined by an interpretation of the contract in which it is used, and that interpretation can only be made by the trial judge.

### FINDINGS OF FACT.

The following is a statement of the net earnings of the American Window Glass Company during the year ending September 7, 1906, as contemplated by the agreement entered into by the plaintiffs and the defendants in this case, and as modified by the explanation in the last clause of that agreement:

| | | |
|---|---:|---:|
| Factory cost of the manufacture of 2,204,894 boxes of glass at $1.4850 per box, as shown by the books of the American Window Glass Co. | | $3,274,236 88 |
| Less the following items not properly chargeable to the actual cost of manufacture: | | |
| Rebates, | $ 1,236 59 | |
| Discount on purchases, | 2,230 61 | |
| Sand Works, | 41,994 34 | |
| Gas Company, | 83,645 17 | |
| Taxes on real estate, | 11,433 20 | |
| Insurance on buildings, | 2,440 45 | |
| Total, | | $ 142,980 36 |
| | | $3,131,256 52 |
| Plus the following items not included in the above statement of factory cost, but properly chargeable to the actual cost of manufacture: | | |
| Premiums, | $ 1,610 17 | |
| Summer cutting, | 53 96 | |
| Ground and chipped glass, | 9,284 43 | |
| Experimental costs, | 25,065 65 | |
| Shut down expenses, $55,057 57 | | |
| Less insurance and taxes, 2,983 57 | | |
| | 52,074 00 | |
| Total, | | 88,088 21 |
| Net factory cost, | | $3,219,344 73 |

Gross sales of 2,204,894 boxes of glass
  at $1.7063 per box,                    $3,762,210 63
Less the following items properly
  chargeable to expenses of sales:
  Selling expenses,                44,197 25
  Shipping expenses,               27,606 35

    Total,                               71,803 60

    Net sales,                       $3,690,407 03
Difference between the net sales and the cost of
  manufacture as found above:
  Net earnings,                                    $ 471,062 30
From which should be deducted the
  expenses of the general office, which
  are properly chargeable to the cost
  of manufacture or to expenses inci-
  dent to marketing the glass:
Total expenses of the general office,    $ 165,704 04
Less—
  Exp. of Auditing Divi-
    sion,                          $10,090 54
  Expenses of Directors
    and Executive Com-
    mittee,                          275 00
  Legal expenses,                    7,806 20

    Total,                               18,171 74

Expenses of Gen. Office, properly
  chargeable to manufacture or to ex-
  penses in the sale of glass,                     147,532 30

Net earnings of the American Window Glass Com-
  pany, exclusive of royalties and interest, as ex-
  plained in the last clause of the contract between
  the parties plaintiff and defendant to this bill,    $ 323,530 00

### CONCLUSIONS OF LAW.

By the terms of the contract between the plaintiffs
and the defendants, the defendant Bodine was to remain
in the employ of the American Window Glass Company
only until the American Window Glass Company should

earn the sum of $500,000, as provided in the contract between the parties.

The meaning of the phrase "whenever said American Window Glass Company shall have earned the sum of $500,000 net, exclusive of royalties and interest," as explained by the last clause of the contract, "The term 'net' in this agreement is understood and agreed to mean the difference between the actual cost of manufacture and the price obtained for the glass," is the difference between the cost of manufacture, excluding such fixed charges as interest, royalties, taxes on real estate, insurance and any other expenses of that character, and the price obtained for the glass after deducting the expenses incidental to marketing the glass.

The American Window Glass Company did not earn, in accordance with the terms of the agreement between the parties to this suit, the sum of $500,000 net, exclusive of royalties and interest, during the twelve months ending September 7, 1906.

The bonds in question are the property of the plaintiffs, M. K. McMullin and T. H. Given, and should be delivered to them.

The court dismissed exceptions and entered a decree that the bonds in question were the property of the plaintiffs, that the defendant, S. L. Bodine, had no title thereto, and that the depository should restore them to the possession of the plaintiffs.

*Errors assigned* were in dismissing the exceptions and the decree of the court.

*John M. Freeman,* of *Watson & Freeman,* and *G. Heide Norris,* with them *Harry F. Stambaugh,* for appellant.

*Samuel McClay* and *W. A. Stone,* with them *W. A. Seifert* and *W. M. Robinson,* for appellees.

PER CURIAM, January 2, 1915:

A majority of the court are of opinion that the construction by Judge EVANS of the contract on which the suit is based is correct and that the decree appealed from should be affirmed for the reasons stated in his opinion.

Decree affirmed at the cost of the appellants.