"The defendant is the owner of a group of buildings in East Newark, several of which are occupied by the complainant as tenant. Complainant operates a rug cleaning and dyeing business, and uses large quantities of steam which it buys from the defendant under a contract embodied in the lease. The dispute relates to the price of the steam. The contract fixes a base price of 75 cents per 1,000 pounds with this proviso:
"`If Landlord's cost to produce steam shall increase between the time of the signing of this lease and the beginning of the term provided for herein, Landlord shall, upon proof thereof, have the right to increase the charge to Tenant sufficiently to compensate Landlord therefor to the extent of Tenant's steam consumption. Landlord shall also have the same right if any further cost increases occur after the beginning of the term; any such increases in cost to Tenant shall be reduced proportionately if and when Landlord's costs decrease again.'
"The term began February 1st, 1946, but the lease was executed six years earlier, December 23d 1939. Early in January, 1946, defendant advised complainant it would charge for steam $1.09 per 1,000 pounds, thereby indicating that the *Page 745 
cost of producing steam had increased 34 cents since the lease was made. On March 1st, defendant billed complainant for steam used in February at $1 per 1,000 pounds, fearing trouble with the O.P.A. if it charged more than that amount. The complainant, after some correspondence, refused to pay this bill and thereupon the defendant warned that it would shut off complainant's supply of steam. The bill of complaint was then filed, praying that defendant be enjoined from carrying this threat into execution. An order was made by consent restraining the defendant, pending suit, on condition that complainant pay for steam at 75 cents. After the defendant answered, an order was made on motion of complainant that its engineer be permitted to examine defendant's steam plant and facilities and the records and charts connected with the operation thereof, and that Messrs. Puder Puder be permitted to examine the accounts of the defendants. This firm was selected by the court when the parties were unable to agree upon an accountant. The final hearing was directed almost exclusively to ascertaining defendant's cost of steam production.
"The complainant argues that defendant has no right to increase the charge for steam until after it submits to complainant `proof' of its increased cost. I agree with complainant that nothing which can be called `proof' was furnished it prior to the final hearing, but I cannot agree with its conclusion that it should not pay more than 75 cents for steam furnished before the hearing. The essence of the agreement between the parties was the provision for payment of increased cost. It is equitable that complainant should pay the increase, regardless of when the proof was submitted. By seeking the aid of the court, it assumed the burden of doing equity.
"The chief question of difficulty in the case goes to the expression `cost to produce steam.' As Mr. Justice Washington said, in Goodwin v. United States, Fed. Cas. No. 5554, `The term (cost) is certainly of an equivocal meaning.' In HazeltonTripod Boiler Co. v. Citizens Street Railway Co.,72 Fed. Rep. 320, the court mentioned `the seemingly insuperable difficulty of ascertaining the cost, for example, of producing *Page 746 
a pound of cotton or of making a yard of cloth.' In McMullin v.Bodine (Pa.), 93 Atl. Rep. 321, where the `actual cost' of manufacturing glass was a factor in a contract, the court excluded those fixed charges which would have been incurred whether or not glass was manufactured. On the other hand, inSaulsbury Oil Co. v. Phillips Petroleum Co., 142 Fed. Rep.
2d 27, 38, which involved `cost of boosting and/or transportation' of oil, indirect overhead and depreciation were included. See, also, Stanwood v. Comer, 188 Mass. 54;Fillmore v. Johnson (Mass.), 109 N.E. Rep. 153; BostonMolasses Co. v. Molasses, c., Corp. (Mass.),175 N.E. Rep. 150.
"The meaning of the term `landlord's cost to produce steam' depends upon the construction of the contract, that is, the intention of the parties. We are apt to think of costs in terms of a year, but the parties had in mind a very much shorter period; cost at the time the lease was made and at the beginning of the term. They anticipated not only a possible increase between the date of the lease and the beginning of the term, but variations from time to time during the four-year term. Also, they meant by cost something readily susceptible of proof. The word `proof' in the contract signifies such data and calculations, supported by such books of account and records as would satisfy an intelligent businessman. I cannot believe that the parties intended a figure that could be reached only after an elaborate investigation and audit such as Mr. Puder has made. The defendant, in its letter of January 10th, 1946, explaining how it reached a rate of $1.09, pointed out that the cost of fuel oil had increased from $1.11 to $1.61 per barrel, an increase of 45 per cent. `Applying this 45 per cent. increase in cost to the base rate of 75 cents per 1,000 pounds, we arrived at the new figure of $1.09 per thousand pounds. Fuel is, of course, the principal expense in the production of live steam. But all other elements of cost have risen at least in the same proportion or more.' The writer recognized that the increase in cost was to be determined by a simple calculation, and in this he was correct.
"It is significant that the parties, when making the lease, did not determine the current cost. They must have meant *Page 747 
by cost at `the time of signing of this lease,' a figure which, six years later, could be derived with reasonable accuracy by inspecting the old books and records of the company. For instance, the defendant, in 1939, as well as in 1946, bought electric current and used some of it in the power plant, but made no record of how much was so used. One of its agents now guesses that 30 per cent. of the electricity bought in the winter of 1939 should be allocated to the cost of producing steam. The price of steam should not depend on this type of estimate.
"These considerations lead me to a rather narrow interpretation of the word `cost.'
"From Mr. Puder's report, the figures below are derived:
 December, 1939 January, 1946
Steam produced .......................... 16,085,970 pds. 23,932,347 pds.
Costs:
Fuel .................................... $4,385.84 $9,933.71
Water ................................... 87.01 115.96
Supplies ................................ 120.63 183.84
Boiler insurance ........................ 11.81 19.98
Wages ................................... 1,051.73 2,604.51
Compensation insurance .................. 5.64 22.51
Social Security Taxes ................... 45.68 80.91
 __________ __________
 $5,696.53 $12,961.42
 December, 1939 January, 1946
Cents, per 1,000 lbs. ................... 35.48 54.15
Repairs ($76.53) ........................ .48 .48
 ______ ______
 35.96 54.63

"In the above table, the amounts shown for fuel and water are the direct cost of fuel oil and water consumed in making steam in December, 1939, and January, 1946. The wages were earned those months by fireman, assistant, helper, machinist and pipefitter. Supplies and boiler insurance are one-twelfth of the cost of steam supplies and the insurance for the years 1939 and 1945. Workmen's compensation insurance and unemployment and old age taxes are in economics a part of the direct cost price of labor, and are so regarded by business men. The items are calculated in accordance with Mr. Puder's formula, namely. The steam wages are 28.15 per *Page 748 
cent. and 32.59 per cent. of all wages for the two months. These percentages are applied to one-twelfth of the premiums and taxes for the two years. The cost of steam repairs was $76.53 for December, 1939, and 13 times that amount, or $981.55, for January, 1946. In the absence of specific proof, I must assume that the latter figure includes major alterations or replacements of a character which the parties did not intend to enter the calculation. I have handled this situation by including in January, 1946, costs the same amount per thousand pounds as in December, 1939. Actual steam repairs during the term of the lease will be stated in the periodical reports mentioned below.
"Mr. Puder's report also includes in the cost of producing steam, a portion of office wages, supplies and telephone based on the ratio of income from sale of steam to total income; 30 per cent. of the cost of electricity on the assumption that this percentage is used in making steam; part of the premiums for general liability and fire insurance and property taxes; depreciation of boiler house and machinery and equipment therein. None of these items should be included as part of the `Landlord's cost to produce steam.' Such expenses are not usually treated in income statements as part of the `cost of goods sold;' they belong in general overhead.
"The defendant shows that part of the steam produced is used to operate auxiliary engines in the steam plant, and a larger portion is lost by radiation. Defendant urges that the steam produced, within the meaning of the contract, is steam available for heating purposes or for sale, and to that end asks that the gross figure of 16,085,970 for December, 1939, be reduced by 29.83 per cent., and the January, 1946, gross be cut 28.25 per cent. This would raise the difference in cost per 1,000 pounds from 18 2/3 cents to 25 cents. Estimates of the amount of steam used by auxiliaries vary from five per cent. to nine percent.; and radiation loss from ten per cent. to 23 per cent. of total steam produced. The defendant has gauges which show the total generated and also the number of pounds sold, but how much of the difference is used by defendant to heat its buildings, how much in auxiliary equipment and how much is lost, cannot be shown with *Page 749 
any reasonable accuracy. Even if additional gauges were now installed so that hereafter the division could be accurately proved, it is impossible to do so for 1939 and so establish the necessary norm. No effect can be given to these factors.
"The complainant, as a condition of relief, shall be required to pay for steam from the beginning of the term at 93 2/3 cents per 1,000 pounds. Payment should be made for the period ending September 30th, 1947, within 15 days after the date of the decree; and for each subsequent month, within the time specified in the lease. Credit will be given, of course, for whatever has been paid on account.
"Both parties ask the court to devise a method for giving practical effect to that part of the contract which reads: `Landlord shall also have the same right if any further cost increases occur after the beginning of the term; any such increases in cost to tenant shall be reduced proportionately if and when landlord's costs decrease again.' Defendant, within 30 days after the date of the decree, shall submit to complainant a statement as follows for the 18 months' period which ended July 31st, 1947:
(1) Number of pounds of steam generated.
(2) Cost of fuel calculated in the manner shown in Puder's schedules A-4 and B-4.
(3) Water calculated as in A-8 and B-8.
(4) Steam supplies.
(5) Ordinary steam repairs.
(6) Wages in the categories shown under `direct allocation' in A-7 and B-7, calculated as in A-7a and B-7a.
(7) State and Federal Social Security taxes paid or reserved for the employees whose wages are shown in (6).
(8) Boiler and workmen's compensation insurance premiums, at the policy rates, applicable to employees whose wages are shown in (6).
(9) Cost per 1,000 pounds to be obtained by dividing the total of (2) to (8) by (1).
(10) Difference between (9) and 54.63 cents.
(11) Pounds sold complainant, multiplied by item (10).
"Defendant shall charge or credit complainant with the sum shown in (11) and shall make available to complainant *Page 750 
such books of account, time books, invoices, and other records as may be necessary to enable complainant's auditor to check the figures. No credit larger than 18 2/3 cents per 1,000 pounds need be given, as defendant is entitled to charge at least 75 cents. Complainant shall pay any balance shown due within 15 days after the statement is submitted to it.
"Similar statements shall be submitted within one month after every February 1st and August 1st for the preceding six months and the same procedure should be followed. These matters are governed by practical business considerations as much as by principles of law or equity. Therefore, if counsel can agree on any changes, they may mould the decree accordingly. Or if they desire to be heard by me, I will be glad to receive them. It may be observed that the rate of 93 2/3 cents is tentative. Only the method of calculation and the December, 1939, cost, $35.96, are final.
"The defendant should be restrained from cutting the supply of steam on account of non-payment, as long as complainant complies with the foregoing directions. The decree should reserve to either party leave to apply for further relief if occasion arises."
The decree will be affirmed, for the reasons expressed in the opinion of Vice-Chancellor Bigelow.
For affirmance — THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, COLIE, EASTWOOD, BURLING, JACOBS, WELLS, DILL, FREUND, McLEAN, SCHETTINO, JJ. 13.
For reversal — None. *Page 751