34 N.J. Super. 156 (1955)
111 A.2d 781
HARRY G. SPECHT, ET AL., PLAINTIFFS-APPELLANTS,
v.
EASTWOOD-NEALLEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 1955.
Decided February 11, 1955.
*159 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Ernest F. Keer, Jr., argued the cause for the appellants (Messrs. Boyd, Dodd, Keer & Booth, attorneys).
Mr. Vincent P. Biunno argued the cause for the respondent (Messrs. Lum, Fairlie & Foster, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
This appeal raises a single issue. Did the trial court err by sustaining the action of the board of directors of the defendant corporation in cancelling the pension of appellant, Harry G. Specht?
A number of additional issues were presented during the course of a protracted trial. However, appellant has expressly accepted the findings on all phases of the case except that relating to his pension.
Eastwood-Nealley Corporation is engaged primarily in the production of wire mesh for use in the paper industry. It has been in existence for about 80 years. From 1935 down to the present time it had outstanding 1,000 shares of common stock. As of 1941 Harry G. Specht was the owner of 45% thereof and shortly thereafter, apparently in 1942, he transferred 100 shares to his wife, Lily Specht, and 100 shares *160 to his son, Harry M. Specht. When the action was brought, this equity interest was still held by the Spechts. 502 shares, or 50%, were and are owned by the defendant, Calvin H. Nealley.
The senior Specht, the only appellant, was actively associated with the company for many years. From 1934 to 1948 he served as general manager and vice-president. On March 9, 1948 he was re-elected vice-president in charge of development (a position of semi-retirement), but was dropped as general manager. Throughout these years he was a director as well. At the meeting of the board of directors in December 1951 he was eliminated completely from the official family of the company, his services were terminated and the pension arrangement involved in this appeal was consummated.
In the years that followed 1942 some changes in the personnel of management took place. Thereafter, serious dissension arose between Specht and the new men over almost every matter of business policy and method of operation of the company. It continued until Specht was removed from active participation in the management.
A great mass of testimony was introduced as to the cause of this strife. The trial court appraised this proof saying:
"There is no one incident or series of incidents that the defendants can point to in order to justify their conclusion. It is something that built up gradually over the years until to them it became intolerable and the now famous reallocation of duties was acted upon in 1948. Apparently Mr. Specht's aggressiveness was the great difficulty. He apparently antagonized everybody he came in contact with, including the labor unions, tax officials, customers, competitors and the like.

* * * * * * * *
Between 1948 and 1952, there is evidence that he did interfere with management to the point of harassment. * * *

* * * * * * * *
Finally, the board of directors regretfully concluded it had not gone far enough in removing Specht as general manager and finally in 1952 he was dropped as an officer and director of the company. Again I say the board's action was inevitable. Concededly it was *161 drastic because it denied board representation to a forty-five percent stockholder of the corporation.
It is the Court's opinion, however, that the board's action in 1952 was justified. * * *"
It appears that in November 1935 the company had issued 300 first mortgage bonds of the face value of $1,000 each. Originally Nealley and his wife held all of them. They were a first lien and Specht concedes they were callable on any interest date prior to maturity. In April 1943 Specht and Nealley (Nealley then owning all the outstanding bonds) executed an agreement under which Nealley agreed to sell Specht one bond each year thereafter at $800 per bond. And Specht was given also an option on the death of Nealley to purchase from his estate all remaining bonds at $700 each.
Toward the end of 1951 the controlling management of the corporation advised Specht that he would not be re-elected an officer or director and negotiations were undertaken for his retirement on pension and for the purchase of his stock. Agreement could not be reached on a price for the stock. At a meeting of the board of directors on January 18, 1951 a resolution was adopted relating to the pension. It provided in part:
"Whereas, Harry G. Specht will be retired on March 11, 1952, and will not thereafter be associated with this company in any capacity, either as a director or as an officer and employee; and
Whereas, Harry G. Specht desires, and the Company is willing to pay, a pension to Harry G. Specht upon his complete retirement as aforesaid and upon certain other conditions hereinafter mentioned, * * *."
Thereafter the resolution provided for the payment of the aggregate sum of $50,000 at the rate of not less than $5,000 nor more than $10,000 a year beginning March 11, 1952 "upon the following conditions":
"(a) Harry G. Specht agrees that he will not disclose to any person, firm or corporation any secret or confidential information relating to any processes, methods of operation, formulae, mechanisms or compositions used by this corporation without its prior written consent;
*162 (b) Harry G. Specht will not compete with this company in the manufacture or sale, or both, of fourdrinier wires, pulp and paper mill wire cloth, valves, special alloy wire and brass mill and foundry products as now or heretofore manufactured and sold by the Eastwood-Nealley Corporation;
(c) Harry G. Specht will not at any time by any representation, word or act on his part, wilfully prejudice, injure or harm the good will, business or reputation of this Corporation, nor will he interfere with, prejudice or disturb in any way the operations of this Company and the harmonious relations between the directors, officers, supervisors and other personnel of the Corporation.
Upon violation of any of the aforesaid terms and conditions, all remaining pension payments shall be forfeited."
Specht objected to paragraph (c) and therefore refrained from voting on the resolution. However, his wife and son either personally or by proxy voted favorably.
On September 25, 1952 the board of directors adopted a resolution to redeem all the corporate bonds outstanding on November 1, 1952. The record discloses that a decision had been reached to purchase new equipment, in particular, looms which were basic to the principal business of the plant, but which had become run down largely because of Specht's business policies. This required substantial financing and since the bonds were the first lien it was deemed necessary to call them in order to make the proposed financing possible. Upon being notified on September 26, Specht immediately protested the action.
On October 27, 1952 this suit was instituted. The named defendants were the Eastwood-Nealley Corporation and Calvin H. Nealley, John G. MacKechnie, Nelson Webb, Andrew MacKechnie, Noah Bass, Ralph E. Lum, Jr., and Harry J. Brady, its officers and directors, and the National State Bank of Newark, the trustee under the bond indenture agreement relating to the bonds which had been called for redemption.
The complaint alleged that the directors conspired, beginning in 1948 and continuously thereafter:
(a) to remove Specht from the company and to deprive him of his salary;
*163 (b) to deprive the plaintiffs of the benefits to which they were entitled in order to force a sale to the defendants or some of them of their stock at a price "far below the true value thereof."
It charged also they "connived and conspired" with fraudulent and unconscionable intent:
(a) to deprive plaintiffs of their just share of the profits of the business by refusing to declare reasonable dividends with the purpose of coercing a sale of their stock at an inadequate price;
(b) to deprive Specht of the benefits of his bond purchase agreement with Nealley by calling the bonds and to exert further pressure on plaintiffs to sell their stock at an inadequate price. And here it was charged that the adoption of the resolution by the individual defendants constituted a "malicious interference" with his contractual rights under the Nealley contract;
(c) to give him a pension but under such terms that it could be revoked at the whim of the directors, and which would prevent any criticism of defendants' conduct of the affairs of the company;
(d) to further deprive plaintiffs of the advantages of their stockholdings by refusing to distribute to stockholders as a stock dividend the company's holdings of the capital stock of another corporation.
It further charged that since 1950 the business of the company had been conducted solely in the interest of certain of the individual defendants for the purpose of defrauding plaintiffs of a reasonable return on their stock and of destroying the value of their stock. And finally it asserted that the individual defendants as directors had refused to act in good faith or to exercise their honest judgment in the declaration of dividends.
Plaintiffs sought judgment which, among other things, would order the forthwith declaration of a dividend; the removal from office of the directors who engaged in the conspiracy and a restraint against their holding any further *164 office; a majority of the stockholders to elect a representative of plaintiffs to the board of directors; and the making available in the future of the complete records of the corporate minutes and all details of the financial operation of the company. They demanded also a construction of the pension resolution; the issuance of an injunction against the company, Nealley and the National State Bank, restraining the redemption of any of the bonds until they had been acquired by Specht under his agreement with Nealley; and compensatory and punitive damages against the individual defendants.
Upon the filing of the complaint interim restraint against redemption of the bonds was granted. Thereafter the injunction was continued pendente lite and appeal was taken therefrom. The Appellate Division affirmed the granting thereof. Specht v. Eastwood-Nealley Corp., 25 N.J. Super. 69 (1953). It is clear from the opinion that the affirmance was predicated upon the charges of fraud and unconscionable conduct contained in plaintiffs' verified complaint. The court said:
"In the present case the allegations of the complaint project the inference that the corporate entity is being used for the accomplishment of an unconscionable objective." (Id., 25 N.J. Super. at page 74).
It is undisputed that the injunction, which remained in force for 19 months, prevented the redemption of the bonds and the consummation of the corporation's plan for refinancing and for the purchase of the new equipment.
At a meeting of the board of directors on November 21, 1952 it was declared that the conditions of paragraph III(c) had been broken by Specht and that consequently the pension was cancelled. The resolution adopted to accomplish this officially, referred to the pending suit, the charges of conspiracy and conniving against the directors and officers and declared that Specht had "sought to interfere with, prejudice and disturb the operations of the company by securing a restraint (which was then outstanding) against the redemption of certain of its bonds and by seeking to compel the declaration of dividends and distribution of surplus, all contrary *165 to the business judgment of said directors," and had "in other divers ways exhibited by the complaint in said action violated the conditions of said pension." (Insertion ours.)
Subsequently during the trial of the action, the complaint was supplemented to charge that the annual election of April 13, 1954 was invalid because Nealley, the president and majority stockholder of the company, was mentally incompetent and could not give a valid proxy. The demand for judgment included a request for the appointment of a receiver and the dissolution of the corporation.
After a long trial the court found that "the charges of conspiracy and the like are completely unfounded * * *." "There is not the slightest evidence of conspiracy that has been proven against the defendants jointly or a fraud proved against them individually. * * *." "There has been no proof whatever of any fraud or conspiracy. It has been shown that the individual defendants acted in concert, but no evil purpose, illegal means or illegal end has been shown. On the contrary, the defendants have amply proved that their actions were justified and were not arbitrary or capricious. The charge of fraud and conspiracy must fall."
And with respect to the charge of mental incompetency against Nealley, president of the company, the opinion pointed out that the only evidence offered to support the claim was Nealley's own testimony, which had been studied carefully. The court concluded that he was a very old man suffering from the usual impediments of old age, that his memory was bad and his capacity to work and think was impaired, but "he is not incompetent at all. He is oriented, he is aware of realities, maintains his own home, has a daily business routine and otherwise gives every indication of a perfectly normal individual, considering his age."
As to the cancellation of the pension, the finding was:
"* * * This Court has determined that the board of directors did not act in an arbitrary or capricious manner in either setting up the pension and providing for its terms and conditions or terminating the pension, and further the Court does find that Mr. Specht *166 did breach the terms and conditions of the pension by the filing of this action. Undoubtedly, Mr. Specht and his attorney had given considerable thought to the effect the bringing of this suit would have on his pension in view of the express condition."
Appellant has accepted the adverse findings of the trial court on the charges of conspiracy and fraud. The ruling on the pension is isolated for challenge.
The briefs contain considerable discussion as to whether the actions of the parties on the pension brought a contract into existence. The pension resolution recites that Specht "desires" and the company "is willing to pay" a pension upon certain conditions, viz., (a) that Specht agree not to disclose secret or confidential corporate information, (b) that he would not enter into business competition with the company, and (c) that he would not willfully prejudice, injure or harm its good will, business or reputation, or interfere with, prejudice or disturb in any way its operations. The first pension payment was made to Specht as of March 11, 1952 and he accepted it. Up to this time he had dissented from clause (c) both orally and in writing. Consequently, his acceptance of the pension installment signified his promise with respect to (a). Further, it denoted performance of conditions (b) and (c) to that date and his expectation of future payment so long as he continued such performance and adhered to his promise. Thus the arrangement constituted a contract which partook of the attributes of both a bilateral and unilateral accord. Abbott v. Arkansas Utilities Co., 165 F.2d 339 (8th Cir. 1948); Langer v. Superior Steel Corp., 105 Pa. Super. 579, 161 A. 571 (Super. Ct. 1932), reversed on other grounds, 318 Pa. 490, 178 A. 490 (Sup. Ct. 1935); 1 Corbin, Contracts (1950), §§ 148, 153; 12 Am. Jur., Contracts, §§ 41, 42, 43; Restatement, Contracts (1932), § 12. The consideration was a mutual and a continuing one; Specht to perform the conditions and the company to make the recurring payments. And so long as Specht honored his bargain, the pension could not be withheld.
*167 When the suit was brought and the restraint obtained, the company felt that the agreement had been breached and cancelled the pension. Appellant seems to regard the reference to the institution of the action in the resolution of the board of directors and in the opinion of the trial court as a declaration that under paragraph III(c) of the pension resolution, Specht could not have recourse to the courts against the corporation to vindicate any cause of action which might accrue to him by reason of the management of or operation of the corporation. Manifestly, a stipulation of that nature would be void as against public policy. 12 Am. Jur., Contracts, § 181, p. 683; 14 Am. Jur., Courts, § 196. But if it existed here, expressly or by unavoidable implication, appellant's position would not be improved, because then the entire contract would be invalidated. Lehigh Valley R. Co. v. United Lead Co., 102 N.J.L. 545 (Sup. Ct. 1926); Cf. Stack v. P.G. Garage, Inc., 7 N.J. 118, 121 (1951); Restatement, Contracts, §§ 606, 607; 6 Williston, Contracts (rev. ed. 1938), §§ 1780, 1782.
However, the pension resolution exhibits no covenant or condition by which Specht deprived himself of the protection of the courts, and we discern no language which carried that ouster as an irresistible implication. 3 Corbin, supra, § 546, p. 93; Restatement, Contracts (1932), § 236(a).
What then is the effect of the agreement as represented by paragraph III(c)? Was any restriction imposed on the privilege of resorting to the courts? In our judgment the language must be construed as constituting a condition that Specht would not institute a suit against the corporation knowing that it would prejudice, injure or harm its good will, business or reputation, or which would interfere with, prejudice or disturb its operations in any way unless probable cause existed for doing so.
The company argues that the problem of cancellation of the pension was one for the business judgment of the board of directors and that court review of their action should be limited to the determination of whether that judgment *168 was honestly exercised. Judicial intervention is not so narrow in this situation. The corporation had assumed a contractual obligation which could be avoided only for breach of the agreement by the other contracting party. Thus the fate of the resolution of cancellation depends upon whether the litigation brought by Specht constituted a violation of clause III(c) of his compact.
There is adequate evidence to support the conclusion of the trial court that the nature and allegations of the suit were sufficient to demonstrate willful prejudice, injury or harm to the good will, business or reputation of the company and interference with its operations. The restraint, which eventuated in an injunction pendente lite, prevented the consummation of the bond redemption plan and purchase of new equipment for many months. The allegations of connivance, conspiracy and fraud in the operation of the business, of refusal of the directors to act in good faith or to exercise their honest judgment in the matter of dividends, of malicious interference with Specht's contractual rights, of operation of the company solely in the interest of certain of the individual defendants in order to defraud plaintiffs, the demand for removal of the directors who engaged in the conspiracy, for election of a representative of plaintiffs to the board and for the immediate declaration of a dividend and the demand for punitive damages, all provide justification for his finding. And in the exercise of our appellate review we find no basis for interference with that result.
But such an action, even though unsuccessfully prosecuted, would not constitute a breach of the contract if probable cause existed for its institution. The critical question, then, is whether such cause was present. The term "probable cause" has an established meaning in the law. It is found and defined most frequently in malicious prosecution actions to which we may turn for guidance.
Probable cause for the institution of a civil suit has been said to be the presence of reasonable ground for belief that the cause of action exists supported by circumstances *169 sufficient to warrant an ordinarily prudent man in the belief that it exists. Mayflower Industries v. Thor Corp., 15 N.J. Super. 139 (Ch. Div. 1951), affirmed 9 N.J. 605 (1952). In connection with the initiation of criminal proceedings, such cause means reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the accused is guilty of the offense with which he is charged. Lane v. Pennsylvania R. Co., 78 N.J.L. 672, 674 (E. & A. 1910); Little v. Little, 4 N.J. Super. 352 (App. Div. 1949); Shoemaker v. Shoemaker, 11 N.J. Super. 471, 476 (App. Div. 1951).
Variant expressions of like import appear in other jurisdictions. Generally speaking, their substance is that probable cause is any combination of facts and proofs which may fairly lead the reasonable mind to the belief that in the absence of unknown or qualifying or rebutting evidence the litigation should be successful. The belief must be an honest and reasonable one and it must be found in circumstances of adequate probative force lying within personal knowledge or information derived from sources of such a character as to lead a reasonably prudent man to regard it as trustworthy. Montgomery v. Dennison, 363 Pa. 255, 69 A.2d 520, 526 (Sup. Ct. 1949); Lotts v. Whitworth, 76 Cal. App.2d 601, 173 P.2d 823, 825 (Dist. Ct. App. 1946); United States v. Johnson, 113 F. Supp. 359 (D.C.D.C. 1953); Ross v. Langworthy, 13 Neb. 492, 14 N.W. 515, 517 (Sup. Ct. 1882).
The test applied to applications for costs and counsel fees in connection with the propriety of a caveat against the probate of a will is substantially that of probable cause. Vice-Ordinary Backes in In re Sebring's Will, 84 N.J. Eq. 453, 455 (Prerog. Ct. 1915), held that to justify such costs, "it must appear that the unsuccessful contestant, whenever he ventures beyond an exploration of the attesting witnesses, had reasonable cause for believing that the paperwriting offered for probate was not the last will and testament of the deceased, and this belief must be shown to have rested *170 upon facts or circumstances sufficient to excite in the probate court an apprehension that the testator lacked mental capacity or was unduly influenced, before the court will favor him in costs."
It is important to note that the standard for appraising the presence of probable cause in a matter like the present one is not the standard of the particular individual involved, for then there would be no objective test for uniform judicial application in such cases. The standard is that of the ordinarily prudent and cautious man exercising conscience, impartiality and reason without prejudice on the facts. Cf. Scott v. Dennett Surpassing Coffee Co., 51 App. Div. 321, 64 N.Y. 1016, 1017 (App. Div. 1900). Without such a pragmatic rule the law would not be serviceable.
Gauged by these considerations, did Specht have probable cause for the institution of these proceedings in the manner in which it was done? The answer resides in the conclusions of the trial court. As already set forth, he declared that the record was barren of the "slightest evidence" of conspiracy or fraud on any phase of the directors' management of the corporation which was subjected to the accusation. Particularly significant is the absence of the slightest evidence of that character in connection with the call of the bonds for redemption, because the injunction was predicated upon such charges in the trial court and sustained thereon in the Appellate Division.
The conclusion of the trial court, who heard and saw the witnesses, in the specific manner in which it was announced, not only established the complete absence of a cause of action for conspiracy and fraud but the lack of probable cause as well. Such conduct by Specht (he found) constituted a breach of the conditions of the pension agreement and here again the record contains adequate evidence in support of that finding.
It may be observed further that in the face of lack of justification the institution of the suit spells out legal malice. The intentional doing of a wrongful act without just cause *171 or excuse constitutes such malice. Mayflower Industries v. Thor Corp., supra, 15 N.J. Super., at page 162; Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1934): Wendelken v. Stone, 88 N.J.L. 267, 269 (E. & A. 1913).
In an effort to justify his position, Specht points to (1) a statement in the opinion that the dividend policy of the board of directors for 1952 and 1953 had been conservative and that it might be well to consider a more liberal policy if earnings continue at the present level; (2) a declaration that one clause in a management control agreement made in 1949 between three of the directors, designed apparently to perpetuate certain persons in office, was void as against public policy; and (3) a statement that Specht had an enforceable agreement with Nealley for the purchase of the bonds, and directing the corporation on the redemption thereof to hold as trustees $42,900, representing $300 on each of the remaining 143 bonds owned by Nealley and subject to Specht's contract, and to pay from the fund each year thereafter, provided Nealley and Specht are both living, $200 to Specht and $100 to Nealley, and upon the prior death of Nealley to pay to Specht the entire balance in the fund.
In effect the argument seems to be that this favorable comment and action by the court satisfies the requirement of probable cause. But we are not dealing with an ordinary stockholder's suit brought to compel the declaration of a dividend or to have part of a management control agreement declared invalid or to obtain an adjudication of the validity of the bond purchase agreement. The charge pleaded and the issues created by appellant with respect to these matters were that the conservative dividend declaration and the control agreement were components of a conspiracy to depress the value of the Spechts' stock and defraud them of its value, and that the calling of the bonds for redemption constituted a malicious interference with contractual rights and was the result of "connivance" of the defendants "in a conspiracy" to destroy the bond purchase agreement, to deprive Specht of its benefits and to exert further pressure on the plaintiffs *172 to dispose of their stock below the true value thereof. (There was never any dispute as to the legality of this agreement, nor did Specht's complaint allege that defendants challenged its legality.) These issues were the ones defendants were called upon to meet and the extravagant charges out of which they were created were adjudged completely unfounded.
On all the proof submitted the judgment of the trial court sustaining the revocation of the pension was correct. Accordingly it is affirmed.