James **JOHNSON** and Walter C. **Raspberry**, Plaintiffs,

v.

The **HERTZ CORPORATION** et al., Defendants.

Civ. No. 509-70.

United States District Court, D. New Jersey.

Dec. 4, 1974.

Bracken & Craig by Stephen J. Edelstein, Newark, N. J., for plaintiffs.

Milton M. Unger and Adrian M. Unger by Adrian M. Unger, Newark, N. J., Goldberger, Seigel & Finn by Howard A. Goldberger, Irvington, N. J., for defendants.

## OPINION

BIUNNO, District Judge:

This case comes before the court by its jurisdiction under 29 U.S. Code, § 185, without regard to the amount involved in controversy and without regard to the citizenship of the parties.

Johnson and Raspberry were employed by Hertz at its auto rental operation in Newark. They were members of Teamsters Local 723, which was the bargain-

ing agent. The labor agreement in force contained provisions in Art. X under which the Union agreed not to call or sanction any strike or "concerted stoppage", with stated exceptions. It agreed to take certain steps on request from Hertz if there were an unauthorized strike or concerted stoppage of work, and Hertz agreed to limit the Union's responsibility if those steps were performed.

Section 4 of Article X reads as follows:

"The Employer during the first twenty-four hour period of an unauthorized work stoppage or strike shall have the sole and complete right of discipline including discharge of employees, and such employee shall not be entitled to or have any recourse to any other provision of this Agreement."

Art. VI of the agreement contained usual provisions for the processing of grievances, and for arbitration, "in the event a misunderstanding or dispute regarding the interpretation of this Agreement occurs."

On November 1, 1968, none of the bargaining unit employees (numbering about 70 or 80) showed up for work. All probationary employees, that is, those recently hired and obliged to join the union but who were not yet members, did show up for work. Hertz officials had reports the night before that this would happen, and was able to draw in management staff to conduct the operation.

From the early morning, the union members phoned in that they were sick and would not be able to work. Raspberry says he told two supervisory people the day before that his back hurt and that he would not be in the next day. Johnson said he was ill and had his cousin phone in that morning to report the fact.

Both Johnson and Raspberry claim they were in fact sick. They claim they had no part in any unauthorized work stoppage. They claim that Art. X, § 4

is void against public policy if read to authorize Hertz to fire anyone it chose, whether involved in the work stoppage or not. They claim that if the provision is read to apply only to those participating in the work stoppage, they were entitled to the benefit of the grievance and arbitration procedures, which the Union failed to prosecute for them. Recovery is sought from both Hertz and the Union.

■■ Putting the legal issues to one side and turning to the facts, there seems to be no question but that there was a concerted work stoppage at the Hertz operation at Newark Airport on November 1, 1968. Now, assuming for the moment that the disciplinary provisions of Article X, § 4, are applicable only to employees who participated in the work stoppage in some fashion, the evidence establishes by a clear preponderance that both plaintiffs did participate. Now, it is true that they have had testimony of their own that they were ill on November 1st but that doesn't end the inquiry. They may have been in fact ill on November 1st but even on the interpretation assumed for this purpose it is obvious that someone who set up the unauthorized work stoppage during the week and happens to get sick the day of the work stoppage can hardly claim to be excused because he was sick that day.

There is testimony of a discussion earlier in the week where a group, including the two plaintiffs, expressed the intention to walk out if the outer garments, the parkas, were not delivered by the end of the week.

■ Section 4 is also quite explicit and this seems to leave no room for interpretation at all, that the employee who is disciplined, including discharge, during the first twenty-four hours of an unauthorized work stoppage or strike is not entitled to and cannot have any recourse to any other provisions of the agreement. It doesn't say "excepting grievance proceeding" and it doesn't say "except the arbitration provision." It says "Shall not be entitled to or have

any recourse to any other provision of this agreement."

So that any contention that the issue of the participation of plaintiffs in the work stoppage should itself be the subject of a grievance or arbitration finds no support in the clause, even construed for this purpose in the fashion that the Court has assumed for the time being.

■ It is a well-established rule that when a person who is the subject of a charge offers an explanation or makes some statement about his conduct or his innocence or anything of that kind which tends to show the charge is not true, and the explanation or statement is shown to be false, then the finder of fact may consider that as being circumstantial evidence pointing to awareness on the part of that individual that the charge was true.

This is based on human experience. Statements and explanations are not ordinarily fabricated when it is not necessary to fabricate them.

There is a very interesting contradiction in the testimony of Mr. Johnson which is part of his exculpatory testimony, which it seems to the Court makes necessary the rejection of his denial of participation. Without regard to the formal designation of specific dates, Mr. Johnson did say that he worked at two locations in this period, that he worked at Newark Airport on Monday, Tuesday and Wednesday, that he was off Thursday and Friday of each week and then reported to the location at the Robert Treat on Saturday and Sunday.

He says that when this incident occurred he had been off for his two days and was supposed to go in for the third day, which would make it Saturday. On the second day of his days off he says he got ill and went to the doctor. Of course, if that is the case he wouldn't have had any situation where he would be concerned about missing Friday. He would have had to be sick the first day in order to have that sequence.

There is no question that the phone call that he was sick and couldn't come in was received on Friday, November 1st, because he did report for work on Saturday, at which time he was told at the Robert Treat that he had been terminated. This is aside from other inconsistencies which the Court feels are sufficient to reject the testimony of Mr. Johnson by way of explanation, which, even if accepted, even if he were in fact sick, would not excuse any participation he had before he got sick by way of urging other employees not to come in to work or by way of threatening them.

The same problem exists with Mr. Raspberry. It seems odd that of the people who worked at this location, who got sick at the same time and the same day, the plaintiffs seem to be the only ones who didn't get a call about the sick-out. Now, the Court must take into account what is well known to everybody. This contract forbade unauthorized work stoppages. It forbade unauthorized strikes. There were penalties for breaching that provision. It is quite obvious that the plaintiffs, along with others, seized upon this widely used but transparent scheme by employees who are not supposed to strike, and this has shown itself in the field of public employment, such as teachers. They all get sick. In New York when it happened it was called a "blue virus". There is no secret about this, and common experience shows that while once in a while there is an epidemic of some kind it is extremely rare that this many employees of one company, except for probationary employees, all get sick at the same time.

The investigation run by both the labor union and the company discloses that people were called or talked to in one fashion or another, and urged not to go in to work on Friday. It couldn't happen any other way. In this regard the Court considers the testimony of the business agent to be beyond any real dispute, namely, that an unauthorized work stoppage of this kind never occurs spontaneously. There is always some kind of leadership or organization behind it. If the employees are all of the same mind, they may not need much in-

ducement. If they are not, the effort cannot be launched without duress of some kind, and that is what makes this denial of Mr. Raspberry and Mr. Johnson incredible, because they were the only two, evidently, who didn't know there was going to be a work stoppage but they both got sick at the same time that everybody else did. The coincidence of this, the Court finds to be incredible.

It should be observed as to the field investigators, whether they were Mr. Sauls or of the employer's staff, that when each of them spoke to an employee and was told that one or the other or both of the plaintiffs had said "Don't go in," or made a threat, that it was not hearsay at that level. They were being told what the plaintiffs said by the person to whom it was said. Of course, as it gets reported it becomes hearsay.

■ This question has been faced by courts before in more explicit ways. There comes to mind a lawsuit involving a lease in which the owner was entitled to charge the tenant not only for rent but for supplying live steam, which was used in the tenant's business operation. There was a provision in the lease that if the cost of producing steam increased the landlord was entitled to an adjustment to reflect that cost, upon proof thereof, or some such language, and the dispute wound up in court. One of the issues was what kind of proof was needed and the court said that the same kind of proof that an ordinary businessman would accept was sufficient, not formal proof. The case is Lincoln Rug Company v. East Newark Realty, 142 N.J. Eq. 743, 61 A.2d 448 (E & A 1948). The original opinion was by Vice-Chancellor Bigelow and it was affirmed on appeal by the Court of Errors and Appeals. But here, of course, we don't even have a requirement of proof. If there were, the Court would feel that the standard described in that case would be appropriate and sufficient.

Why is that? Well, for one thing it is quite plain that since this right that § 4 calls for must be exercised, if at all,

during the first twenty-four-hour period of an unauthorized work stoppage or strike, it obviously would be unrealistic to expect some kind of formal factfinding proceeding to take place in that time.

■ Beyond that the Court is of the view that the provision, § 4, actually does say and means that it applies to employees whether they were involved in the work stoppage or not, and that as so construed it is valid. This contract was negotiated between a large employer and a large—at least in affiliation—labor organization, and it is well known that the Teamsters and other national labor organizations maintain central files of labor contracts and they pay close attention to this kind of language, particularly in an area having to do with the right to strike and its consequences.

Both sides obviously are well equipped to say what other contracts do say typically, that the company should have the right to discipline or discharge "any and all of the employees involved" in a clause of this kind. That language is not in here. There is nothing to suggest that these parties didn't know enough to put it in, if that is what they meant, and the Court cannot make a new contract for them.

On validity, is this too extreme? Well, there are analogies. It is well-established law that the testator may say "If anybody brings a proceeding to challenge my Will he doesn't get a nickel." The most recent recognition of the validity of that kind of provision by the highest court in New Jersey is Alper v. Alper, 2 N.J. 105, 65 A.2d 737. It's a 1949 case.

There is another example, also a reported case, in which a company official was retired and put on a pension, and there was a condition to his pension that if he did anything to harm the company the company could terminate the pension. Well, he started a lawsuit against the company which he well knew created some serious financial problems for the company, and which he knew, or should have known, lacked probable cause to sup-

port it, and the company passed a resolution declaring the pension terminated. The court ruled that it had every right to do so. Specht v. Eastwood-Nealley Corporation, 34 N.J.Super. 156, 111 A.2d 781 (App.1955).

Another example is the acceleration clause in the field of private mortgage lending. It is quite common to make loans on a personal, selective basis, and when that is done, at least if the lender is properly represented, you will usually find a provision that if the title to the property is transferred in any way whatever or, if it is a residence, if it is used or occupied by any person other than the borrower and his immediate family, the entire balance of the mortgage falls due and payable. That is the only way you can make the loan. It is a personal loan. If the property is used for anything else, if he's going to rent it out, if he's going to sell it, that lender wants to be paid. He is going to do his own lending. He is going to select his own borrowers and that is how it is done. There is nothing wrong with it. It can be enforced. If he wants to recast the loan, he has the option. To put it in the terms that Jimmy Durante used to do, this is the clause that says "Just for dat, everybody's gotta get off."

Why does this make sense and why is it reasonable and lawful? Well, because when a work stoppage is unauthorized and when it is carried out through concealment, the device of a false, universal illness, the burden of getting into questions of proof makes any other course meaningless. So this kind of provision eloquently tells the employees that if any of them misbehave they are all subject to this sole and complete right of discipline, including discharge, and it looks to and relies upon the mutual and common interest of the employees to prevent the conduct which the clause is designed to control; and if they know that it means this, and are approached by a Johnson or a Raspberry, they won't listen to him. They will go in to work. There won't be an unlawful and unauthorized work stoppage, and

the clause can't be invoked. That is how it is designed to work, and it is a perfectly proper purpose.

This opinion is to be taken as the Court's findings of fact and conclusions of law and judgment will be entered for the defendants.

Submit an order as soon as the form can be agreed upon.